UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

THOMAS MODRELL,

    Plaintiff,

v.

AETNA LIFE INSURANCE
COMPANY,

    Defendant.

Case No. 22-10299

HON. _____
United States District Judge

HON. _____
United States Magistrate Judge

_____

## COMPLAINT

Now comes Plaintiff Thomas Modrell, by and through counsel, and for his Complaint against Defendant Aetna Life Insurance Company, alleges as follows:

### Nature of Action

1. This is an action brought pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), to recover long term disability benefits owed under the terms of a group insurance contract issued by Aetna Life Insurance Company.

## Parties

2. Plaintiff Thomas Modrell is a resident of Wayne County, Michigan.

3. Defendant Aetna Life Insurance Company (hereinafter "Aetna") is a Connecticut insurance company that does business throughout Michigan, including Wayne County.

## Jurisdiction and Venue

4. This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 § U.S.C. § 1331.

5. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

## Count I: Claim for Long Term Disability Benefits Pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B)

6. At all material times, Mr. Modrell was covered for long term disability benefits under the terms of a group insurance contract issued by Aetna to Mr. Modrell's employer, Harman International Industries, Inc.

7. A certificate of coverage detailing the terms and conditions of the group insurance contract was delivered to Mr. Modrell in Michigan by Aetna.

8. Under the terms of the Aetna insurance contract, an insured is considered disabled during the first 24 months of disability if:

    a. "You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition; and;

    b. Your earnings are 80% or less of your adjusted predisability earnings."

9. After the first 24 months, "you meet the plan's test of disability on any day you are unable to work at any reasonable occupation solely because of an illness, injury or disabling pregnancy-related condition."

10. Mr. Modrell worked as a senior sales manager for Harman, selling acoustic and audio systems in particular to General Motors -- a job that required extensive travel and client contact in person, by telephone, and by electronic means.

11. Mr. Modrell's job also required him "to manage existing business and grow the GM global audio portfolio."

12. Mr. Modrell suffered severe cardiac arrest while jogging on October 20, 2015, causing an anoxic brain injury that has resulted in persistent cognitive deficits in working memory, attention, and executive functioning.

13. After his October 20, 2015 cardiac arrest, Mr. Modrell was taken to St. Mary Mercy Hospital, where he was hospitalized until November 3, 2015.

14. The St. Mary Mercy Hospital records provide this description of Mr. Modrell's clinical background when he was admitted:

    The patient is an unknown gentleman of unknown age who was reportedly jogging. He passed a couple who turned around to come back from their walk about 5 minutes later and noticed him down on the ground. He was in jogging shorts, t-shirt, and jogging shoes, without identification. EMS was called and they arrived within a few minutes, and the patient was noted to be in ventricular fibrillation. He was shocked back into sinus rhythm, and a blood pressure returned after CPR. The EKG demonstrated an anterior wall myocardial infarction. He was intubated and brought to the ER where the EKG continued to demonstrate anterior wall infarction. The patient was breathing on his own, assisted by the ventilator, but had no purposeful motion.

15. Mr. Modrell was diagnosed with anoxic encephalopathy secondary to cardiac arrest.

16. On November 3, 2015 Mr. Modrell was transferred to St. Joseph Mercy Hospital, where he remained hospitalized until November 17, 2015.

17. Mr. Modrell was then transferred to St. Joseph Mercy Rehabilitation Services for intensive cognitive rehabilitation until December 21, 2015, and he has since treated extensively with several physicians at Michigan Medicine as well as with Dr. Ari Kriswari, a specialist in physical medicine and rehabilitation.

18. Aetna initially approved Mr. Modrell for short term disability benefits.

19. As Mr. Modrell approached the date for transitioning to long term disability, he decided to try to return to work at the end of March 2016.

20. Mr. Modrell worked diligently at rehabilitation and attempted to return to work four hours per day, three days a week.

21. Even this limited return to work resulted in extreme fatigue, and Mr. Modrell's cognitive problems prevented him from succeeding, and Mr. Modrell has not worked since that time.

22. Mr. Modrell applied for long term disability benefits on April 3, 2016, Aetna initially approved his claim for benefits on August 25, 2016, but only for a closed period ending on July 4, 2016, when Mr. Modrell intended to return to work.

23. In August 2016, Dr. Kriswari limited Mr. Modrell to 2-3 hours of work per day, which Harman could not accommodate, and on September 26, 2016, Aetna reinstated Mr. Modrell's claim effective September 3, 2016.

24. Aetna then continued paying Mr. Modrell's long term disability benefits until June 30, 2018.

25. During this time, Aetna accumulated a large volume of medical and vocational records supporting Mr. Modrell's disability claim.

26. For example, Dr. David Marshall, a clinical neuropsychologist at Michigan Medicine, has explained that Mr. Modrell's cognitive deficits are significant within Mr. Modrell's very high premorbid baseline (Mr. Modrell's full scale IQ is in the superior range, and his perceptual reasoning index is in the very superior range).

27. Dr. Marshall painted this picture of how Mr. Modrell's cognitive deficits affect his functionality in a February 20, 2018 neuropsychological examination report:

> Overall, neuropsychological data continues to show very strong intellectual abilities with many intact and stable cognitive performances compared to his two prior neuropsychological evaluations. However, a significant lowering was noted in his verbal contextual memory, namely encoding and retrieval, compared to his 2016 evaluation though current performance was still an improvement compared to his 2015 evaluation. Furthermore, he demonstrated relative weaknesses in working memory, aspects of executive functions, and attentional functioning and while these are stable compared to 2015, though a slightly lower performance in mental set-shifting compared to 2016, they remain well below expectation given his very strong intellectual abilities and estimated high premorbid functioning based on educational and occupational attainment (Master's degree and worked as a Global Senior Sales Manager).

28. Speech Pathologist Michelle Shenton reported in a June 7, 2018 assessment that, among other things:

- Mr. Modrell is a 51-year-old gentleman with a history of anoxic brain injury in 10/2015 due to a sudden cardiac arrest. Since that time, the client continues to demonstrate cognitive deficits including reduced attention, memory and executive reasoning skills. He was unsuccessful with his attempt to return to his very high level job in 2016.

- Mr. Modrell demonstrates guarded prognosis given the amount of time since his injury.

- Cognitive skills are significantly impaired and require further formal assessment/treatment of attention, memory and executive functioning.

29. Nevertheless, Aetna sent Mr. Modrell a letter on June 29, 2018 notifying him that his disability benefits would be terminated effective July 1, 2018.

30. Aetna's denial rationale relied in large part on Aetna's claim that: "A board-certified neuropsychologist at Aetna reviewed Dr. Marshall's February 20, 2018 Neuropsychological Evaluation report in its entirety, including your test score results," and "Aetna's Neuropsychologist does not agree with all of Dr. Marshall's restrictions and limitations."

31. The denial letter further claimed:

> Aetna's Neuropsychologist could not identify any findings in the February 20, 2018 Neuropsychological Evaluation, including your cognitive profile, which support that you have ongoing impairments from neurocognitive perspective, including memory. Aetna's Neuropsychologist explained, in review of the findings, that your memory function is very good.

> Aetna's Neuropsychologist suspects psychological symptoms may have led to you over‐reporting symptoms of memory complaints. However, Aetna's Neuropsychologist could not identify any findings in the records which support you have a mental health disorder of such severity to prevent you from returning to work.
>
> Aetna's Neuropsychologist explained your relative weaknesses demonstrated in executive functioning and complex attention do not rise to the level impairment that would prevent you from returning to work any occupation, including performing the duties and temperaments of a Sales Manager.

32. However, this turned out to be fundamentally untrue in that "Aetna's neuropsychologist," Dr. Angelo Domingo, is not board-certified and did not issue any type of report to Aetna.

33. Rather, Dr. Domingo simply participated in a Strategic Claim Discussion at Aetna, where he was presented with a summary by a claim handler, and Dr. Domingo's opinions were drawn from a cursory review of that claim summary.

34. Moreover, Dr. Domingo's conclusions are directly contradicted by the Validity Summary contained in Dr. Marshall's February 20, 2018 neuropsychological testing report, which states: "The patient performed within the optimal range on all freestanding and embedded measures of cognitive performance validity. Therefore, results are thought to be a valid estimate of his current cognitive abilities."

8

35. Moreover, Dr. Marshall's February 20, 2018 results are not only internally consistent, they are consistent over three comprehensive neuropsychological tests from 2015 to 2018.

36. The Aetna denial letter also stated:

> On August 25, 2016, we told you about our Social Security vendor Allsup. We explained in our letter of that date that under the terms of the group LTD policy you are required to apply for Other Income Benefits, which include Social Security Disability Income (SSDI).
>
> At the time we told you about Allsup, we had enough information to show that you were not able to work. We also thought you would be eligible for SSDI benefits for a short period of time or longer.
>
> Since August 25, 2016, we received new information, including the medical records discussed in this letter. We also received a copy of the September 7, 2017 letter Social Security sent you, in which they informed you that your SSDI claim was denied.
>
> Social Security explained in their September 7, 2017 letter, "Based on a review of your health problems you do not qualify for benefits on this claim. This is because you are not disabled under our rules."

37. This statement was also deceptive on Aetna's part in that, although Aetna had retained Allsup to handle Mr. Modrell's Social Security Disability claim, and Aetna had instructed Mr. Modrell to rely on Allsup for that purpose, it turned out that Allsup had not provided *any* medical documents to the Social Security Administration to support Mr. Modrell's claim, effectively scuttling Mr. Modrell's claim completely and enabling Aetna to rely on the Social Security denial as a basis for discontinuing long-term disability benefits.

38. When Mr. Modrell retained a new representative who actually submitted his medical records to the Social Security Administration, he was awarded Social Security Disability benefits in a decision issued by Administrative Law Judge Ramona Fernandez, who concluded that "there are no jobs that exist in significant numbers in the national economy that the claimant can perform."

39. Mr. Modrell proceeded with an appeal of Aetna's adverse benefit decision, supplying additional records supporting the fact that he remained disabled under the terms of the Aetna insurance contract.

40. Mr. Modrell's primary care physician, Dr. Julie Prussack noted on October 11, 2018 that he continues to suffer from chronic fatigue, anoxic brain injury, moderate recurrent major depression, peripheral polyneuropathy, and Raynaud's disease.

41. Dr. Prussack specifically remarked that Mr. Modrell "[c]ontinues to have difficulty remembering details of previous history/medication trials or conversations we have had," pauses significantly while speaking, and has to take notes regarding her instructions.

42. Dr. Kriswari similarly noted on November 19, 2018 that Mr. Modrell still needs reminders to manage his daily routine, writing down reminders most of the time, and "[h]is wife helps him with providing direction."

43. Dr. Kriswari suggested limiting Mr. Modrell's activity due to his impairments: "He can start with doing more volunteer work, part of a structured activity as he can tolerate."

44. Clinical Psychologist Dr. Elissa Fronczak confirmed that Mr. Modrell is not "cognitively capable of return to work."

45. Importantly, Mr. Modrell is considered disabled under the Aetna insurance contract unless he can return to a job where he is expected to earn an income of more than 80% of his adjusted predisability earnings.

46. It is not enough if Mr. Modrell can do some work, he must be able to walk into a job where he can immediately perform the work necessary to earn a substantial six-figure salary.

47. To assess this prospect, Mr. Modrell was referred for a comprehensive Vocational Rehabilitation Evaluation by Dr. Robert Ancell, who concluded "there is no way that Mr. Modrell can perform his past relevant work or any jobs that would flow from that type of work."

48. Dr. Ancell elaborated:

> Mr. Modrell is having difficulty even functioning in the most simple of terms in his home. For one to suggest that he would be able to be at the high end of executive functioning with multitasking, complex relationships and analysis, defies creditability in light of the recognized medical records establishing anoxic brain injury. Therefore, when one considers his cognitive, emotional, and higher level executive functioning limitations, he is totally unable to perform any type of work that he was otherwise qualified to perform. At the present time, given the fact that the only suggestion as it relates to his ability to work would be volunteer work, there are absolutely no jobs that exist that would allow Mr. Modrell to earn his 80% threshold.

49. Mr. Modrell's job as a global sales manager at Harman relied heavily on the cognitive functioning that Dr. Marshall and others have repeatedly found to be impaired.

50. Mr. Modrell's job description makes it clear that his six-figure salary was based on a high level of performance, including supervision of others, managing customers, and reporting to the top hierarchy of the company.

51. Mr. Modrell was required to be "[c]apable of handling multiple projects/initiatives simultaneously and executing to completion," and his cognitive impairments made this impossible.

52. Because Mr. Modrell could not possibly perform this type of work, he requested Aetna to reinstate his benefits in his appeal.

53. On January 30, 2019, in the course of considering Mr. Modrell's appeal, Aetna wrote to Mr. Modrell regarding a record review, stating:

> We recently had an independent medical review completed by a physician who specializes in Occupational Medicine. The reviewer attempted to discuss your case with Dr. Farrehi, Dr. Kriswari and Dr. Prussak but was unsuccessful. As such, we sent a copy of the report to each provider and asked for a response in the event they disagree with the conclusions rendered. A response is needed within 10 business days from today's date, or, February 13, 2019.

54. When Mr. Modrell requested a copy of the record review report so that he could comment on it, Aetna refused to provide a copy, stating in a February 12, 2019 letter:

> With regards to your request for a copy of the independent medical review completed, please note that Mr. Modrell's LTD claim was received prior to the April 01, 2018 ERISA regulatory changes therefore we will follow the process in place as of the date the LTD claim was filed, or February 04, 2016. This process does not include sharing information developed during the appeal review while the appeal review is underway. At the conclusion of the appeal review, you will have access to any and all data that is in the claim file.

55. Mr. Modrell also requested copies of the Aetna's records regarding the retention and payment of Allsup to handle Mr. Modrell's Social Security Disability claim, but Aetna refused this request on March 13, 2019, stating: "that data is not part of this administrative record as the contract is not on an individual claim basis. We are unable to provide you that information."

56. Aetna issued a denial of Mr. Modrell's appeal on March 27, 2019.

57. Among other things, Aetna claimed:

> From a cognitive functionality perspective the file was reviewed by a peer reviewer who specializes in Psychology and Neuropsychology. It should be noted that while all medical data was reviewed, only the medical information which have a particular relevance to the questions posed and the time frame identified from June 20, 2018 to the present and within the scope of behavioral health specialization were directly commented on in the peer review report. The peer reviewer found a lack of support for a functional impairment related to cognitive decline beyond June 20, 2018.

58. In effect, without examining Mr. Modrell, the Aetna reviewer simply disagreed with the clinical neuropsychological assessment of Dr. Marshall.

59. Aetna had requested that Mr. Modrell go through another neuropsychological examination, and he did so on March 25 and 26, 2019 with a board-certified neuropsychologist, Dr. Bradley Sewick.

60. Dr. Sewick performed a comprehensive neuropsychological examination and issued his report on April 8, 2019, concluding that:

> Mr. Modrell is being followed in treatment by Dr. Prussack and others at this time. He has had multidisciplinary rehabilitation interventions. He has had psychotherapy and counseling and may resume such. Unfortunately, he is now three-and-a-half years status post anoxic encephalopathy and continues to experience a combination of symptoms that seriously adversely impact his abilities to resume prior levels of functioning. He is able to drive and perform routine tasks and possesses strong verbal communication and nonverbal problem-solving skills, but the deficits and impairments that he experiences in other areas of neuropsychological functioning markedly reduce his abilities to effectively functionally apply those skills. Unfortunately, given the chronicity of his impairments, I do not think that we are going to see additional recovery within the neuropsychological sphere. Again, there may be some variations noted in his cognitive functioning associated with his mood disturbance and difficulties with sleep and regulatory functions and neurofatigue, etc., but this will be likely largely on an unpredictable basis. I do not think he is capable of returning to the demands of his prior occupation or another high cognitive demand occupation. At the same time, he feels the need to be productive and contribute, etc. I think that this is important from an emotional and behavioral perspective and would recommend that he pursue volunteer work that would not be competitive but wherein he may be able to utilize his skills that may be applied at a pace he can tolerate.

61. Dr. Sewick specifically diagnosed Mr. Modrell with:

    1. Neurocognitive Disorder secondary to 10/20/15 anoxic encephalopathy

    2. Mood Disorder secondary to 10/20/15 anoxic encephalopathy

    3. Elements of Organic Personality Syndrome and personality change secondary to 10/20/15 anoxic encephalopathy

    4. Hypersomnia consistent with history of 10/20/15 anoxic encephalopathy

62. On April 24, 2019, Mr. Modrell furnished Aetna with a copy of the Notice of Decision issued by Administrative Law Judge Ramona Fernandez, finding that Mr. Modrell has been disabled since September 1, 2016, and on May 28, 2019, Mr. Modrell furnished Aetna with a copy of the Notice of Award he received from the Social Security Administration.

63. On June 12, 2019, Aetna wrote to Mr. Modrell, discussing his Social Security Disability benefits, and Aetna offered Mr. Modrell another a second appeal review.

64. Mr. Modrell submitted a second appeal of Aetna's adverse decision on December 9, 2019, including additional medical records.

65. On March 17, 2020, Aetna sent an email to Mr. Modrell's counsel stating that the appeal was denied: "Based upon our review, the initial decision has been upheld. The determination is based on plan provisions."

66. Aetna has wrongfully discontinued Mr. Modrell's benefits, which are payable under the terms of the Aetna insurance contract and the facts presented.

67. Mr. Modrell has exhausted his administrative remedies, and he has no further recourse other than filing this action to recover the benefits that have been wrongfully denied by Aetna.

68. ERISA authorizes insurance beneficiaries such as Mr. Modrell to recover benefits and enforce their rights to benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

69. Therefore, it would be appropriate for the Court to award Mr. Modrell the benefits to which he is entitled under the terms of the Aetna insurance contract and ERISA, 29 U.S.C. § 1132(a)(1)(B) with interest.

70. It would also be appropriate for the Court to award Mr. Modrell his costs and reasonable attorney fees incurred in this action pursuant to ERISA, 29 U.S.C. § 1132(g)(1).

## **Request for Relief**

Wherefore, pursuant to 29 U.S.C. § 1132, Plaintiff requests this Honorable Court to enter judgment in his favor against Defendants for the full amount of long term disability insurance benefits owed, together with appropriate costs, interest, and statutory attorney fees.

Respectfully submitted,

*s/Robert B. June*
Robert B. June
Law Offices of Robert June, P.C.
Attorney for Plaintiff
415 Detroit Street, 2nd Floor
Ann Arbor, MI 48104-1117
Phone: (734) 481-1000
Primary E-Mail: bobjune@junelaw.com
Attorney Bar Number: P51149

Dated:  February 14, 2022